## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ZAUSNER FOODS CORP., a Delaware corporation, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-1769-RGA-CJB |
| | ) | |
| ECB USA, INC., a Florida corporation, ATLANTIC VENTURES CORP., a Florida corporation, G.I.E. C2B, a French Entity, CLAUDE BLANDIN, BRUNO BLANDIN, PATRICK BLANDIN, and ARNO LEONI, individuals, and JOHN DOE DEFENDANTS 1-10, | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

### REPORT AND RECOMMENDATION

In this case, Plaintiff Zausner Foods Corp. ("Plaintiff" or "Zausner") brings breach of contract and related claims, including state law tort claims, against Defendants ECB USA, Inc. ("ECB"), Atlantic Ventures Corp. ("AVC"), G.I.E. C2B ("C2B"), Claude Blandin, Bruno Blandin, Patrick Blandin and Arno Leoni ("Leoni") (collectively, "Defendants").[1] Pending before the Court is Defendants' motion to dismiss the operative First Amended Complaint ("FAC") and to strike (the "motion to dismiss"); and (2) Plaintiff's alternative motion for jurisdictional discovery (the "motion for jurisdictional discovery"). (D.I. 42; D.I. 45) For the reasons set forth below, the Court recommends that the motion to dismiss be GRANTED-IN-PART and DENIED-IN-PART, and the Court DENIES the motion for jurisdictional discovery.

## I.    BACKGROUND

---

[1]    Claude Blandin, Bruno Blandin, Patrick Blandin and Leoni will be referred to herein as the "Individual Defendants."

A.     **Factual Background**

1.     **The Parties and Relevant Non-parties**

Plaintiff is a Delaware corporation with its principal place of business in Pennsylvania. (D.I. 39 at ¶ 1)  Non-party ZNHC, Inc. ("ZNHC") was a Delaware corporation; it was Plaintiff's subsidiary, and it later merged into Plaintiff and thus no longer exists as a separate entity.  (*Id.* at ¶¶ 4, 38)  Non-party Schratter Foods, Inc. ("SFI") is a Delaware corporation, which was headquartered in Fairfield, New Jersey as of the time of certain relevant events in this case; it is now headquartered in Florida.  (*Id.* at ¶ 6)  SFI was a subsidiary of ZNHC, and is a specialty foods company that both imported and distributed various food products, including cheeses.  (*Id.* at ¶¶ 37-38)

ECB and AVC are Florida corporations with their principal places of business in Florida. (*Id.* at ¶¶ 2-3)  C2B is a French "'cash-pooling'" entity based in the French territory of Guadeloupe, which is tasked with managing and funding entities related to Claude Blandin, Bruno Blandin and Patrick Blandin (collectively, "the Blandins").  (*Id.* at ¶¶ 13-14)  The Blandins are the owners and operators of a group of French entities, through which they in turn own and operate ECB, AVC and C2B.  (*Id.* at ¶ 8)  The Blandins are all French citizens.  (*Id.* at ¶¶ 9-11)  Following the closing of the Stock Purchase Agreement ("SPA")—a contract at the heart of the claims discussed herein—Claude Blandin became the President of SFI, and Bruno and Patrick Blandin became directors and officers of SFI.  (*Id.*)  Leoni is a French citizen who is an associate of the Blandins; he was appointed CFO of SFI in the third quarter of 2015, became co-CEO of the company in February 2017 and became sole CEO in May 2017.  (*Id.* at ¶ 12)  Leoni is also the sole owner of Ilafy Development, LLC, which became a 2% owner of AVC after the Blandins purchased SFI.  (*Id.*)

2

2.        **Relevant Transactions**

On December 6, 2014, the SPA was executed.  (*Id*. at ¶ 46)  With the SPA, ZNHC sold all of the outstanding shares of SFI to ECB and third-party Voss Enterprises, Inc. ("VEI").  (*Id*.; D.I. 39, ex. 1 ("SPA"))  Plaintiff was a guarantor regarding the sale.  (*Id*.)  On December 10, 2014, ECB and VEI assigned their interests in SFI to AVC; ECB and VEI owned 55% and 45% of AVC, respectively.  (D.I. 39 at ¶ 47)  On December 31, 2014, the transaction officially closed ("the closing").  (*Id*. at ¶ 48)

The initial purchase price for SFI was $27 million.  (*Id*.)  This money was payable in the following ways:  (1) $2 million was due at the closing; (2) $15 million was due at a second closing in June 2015; and (3) four annual, equal subsequent installments of $2.5 million were each due thereafter (the "Subsequent Installments").  (*Id*.)  On June 16, 2015, the parties to the SPA entered into Amendment No. 1 to the SPA; in Amendment No. 1, the parties agreed to a downward adjustment of the total amount of the Subsequent Installments from $10 million to $6.1 million (with each such installment payment now being $1.525 million instead of $2.5 million).  (*Id*. at ¶¶ 61-62)

Along with the SPA, ZNHC entered into the Stock Pledge Agreement with ECB and VEI; the Stock Pledge Agreement is incorporated into the SPA via the SPA's Section II.3(b) and is attached to the SPA as an exhibit.  (*Id*. at ¶ 49; D.I. 39, ex. 1 at ex. C ("Stock Pledge Agreement"))  Pursuant to the Stock Pledge Agreement, ECB and VEI pledged 90% of SFI's stock as collateral to secure the Subsequent Installments due to ZNHC (in the event of ECB and VEI's default).  (D.I. 39 at ¶ 50; Stock Pledge Agreement at ¶¶ 1(d), 2, 3)

Much went wrong from there in terms of relations between the relevant parties.  As a result, *inter alia*, ECB and AVC did not pay the $6.1 Subsequent Installments—an outcome that,

3

in significant part, led to this lawsuit.  (D.I. 39 at ¶ 64)[2]  ECB and AVC also sold SFI's assets to

Atalanta Corporation ("Atalanta") in February 2018 for at least $12 million.  (*Id.* at ¶¶ 98-99,

102)  Subsequently, on April 30, 2018, Defendants caused SFI to file an Assignment for the

Benefit of Creditors Proceeding (an "ABC Proceeding") in Florida, which resulted in SFI being

liquidated.  (*Id.* at ¶¶ 107-08)  Plaintiff alleges that this "destroyed, dissipated and disposed of

the value of [its] security interest in 90% of the shares of SFI" that had been pledged as collateral

to secure the Subsequent Installments.  (*Id.* at ¶ 108)

Additional relevant factual allegations will be discussed below in the appropriate portions

of Section II.

### B.    Procedural Background

On December 24, 2020, Plaintiff filed its initial Complaint in this case.  (D.I. 1)  On

February 1, 2021, United States District Judge Richard G. Andrews referred the case to the Court

for all purposes through the case-dispositive motion deadline.  (D.I. 15)  On April 12, 2021,

Plaintiff filed the FAC.  (D.I. 39)  The FAC contains nine causes of action:

- First Cause of Action:  Breach of contract—i.e., the SPA—
  against ECB and AVC.  (D.I. 39 at ¶¶ 129-43)

- Second Cause of Action:  Breach of contract—i.e., the Stock
  Pledge Agreement—against ECB and AVC.  (*Id.* at ¶¶ 144-49)

- Third Cause of Action:  Breach of contract—i.e., Amendment
  No. 1—against ECB and AVC.  (*Id.* at ¶¶ 150-55)

- Fourth Cause of Action:  Breach of the implied covenant of
  good faith and fair dealing (relating to the Stock Pledge
  Agreement) against ECB and AVC.  (*Id.* at ¶¶ 156-65)

---

[2]    The parties and related entities are also involved in various other litigation matters with each other.  These suits include *ECB USA, Inc. v. Savencia S.A.*, Civil Action No. 19-731-RGA-CJB (D. Del.), a case in this Court that also has to do with the SPA (the "Related Litigation").

4

- Fifth Cause of Action:  Equitable accounting against all Defendants.  (*Id.* at ¶¶ 166-73)

- Sixth Cause of Action:  Tortious interference with contract against the Individual Defendants and C2B.  (*Id.* at ¶¶ 174-80)

- Seventh Cause of Action:  Conspiracy to commit tortious interference with contract against the Individual Defendants and C2B.  (*Id.* at ¶¶ 181-87)

Below, for ease of reference, the Court will refer to these causes of action as "Counts" (e.g., Count I, Count II, etc.).

On May 6, 2021, Defendants filed the motion to dismiss, (D.I. 42), and on June 1, Plaintiff filed the motion for jurisdictional discovery, (D.I. 45).  Briefing was completed on the motions by July 7, 2021.  (D.I. 52)  Plaintiff requested oral argument on the motions, (D.I. 48; D.I. 49), which request is hereby DENIED.

## II.    DISCUSSION

Defendants make various challenges to Plaintiff's FAC in their motion to dismiss.  The Court will address those challenges in turn below.

### A.    Standing

Defendants first argue that all claims against them should be dismissed for lack of subject matter jurisdiction and because Plaintiff lacks standing to bring the claims.  (D.I. 43 at 7-10) These arguments stem from Defendants' assertion that ECB and AVC do not owe any obligation to Plaintiff under the SPA—and thus that Plaintiff does not have standing to assert its claims pursuant to the contracts at issue—because ZNHC, not Zausner, was the signatory to the SPA (as the "Seller")[3] and the Stock Pledge Agreement.  (*Id.* at 7)

---

[3]        Again, a representative of Zausner did sign the SPA, but only as a "Guarantor" and not as the "Seller."  (SPA at 75-76)

The Court first addresses the relevant standard of review.  With their argument here, it appears that Defendants are raising a "prudential standing" question:  i.e., one that implicates the requirement that a plaintiff must generally assert his own legal rights and interests, and may not rest his claim to relief on the legal rights or interests of third parties.  *In re Majestic Star Casino, LLC*, 716 F.3d 736, 748 (3d Cir. 2013); *Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 610-11 (D. Del. 2018); *see also* (D.I. 43 at 7-10 (in this section of its briefing, Plaintiff repeatedly asserting that this is a "standing" issue and referencing only "prudential standing[,]" not Article III standing)).  Normally "lack of standing" arguments are considered jurisdictional issues assessed under Federal Rule of Civil Procedure 12(b)(1), though there is some question in the courts as to whether a prudential standing challenge is appropriately analyzed pursuant to Rule 12(b)(1) or Federal Rule of Civil Procedure 12(b)(6).  *Harrison*, 320 F. Supp. 3d at 610-12 (citing cases); *see also Martinez v. Bank of Am., N.A.*, 664 F. App'x 250, 252 n.3 (3d Cir. 2016) (noting that whether a prudential standing issue is properly assessed as a non-jurisdictional issue under Rule 12(b)(6) is an open question, but not deciding the issue).

In this case, the Court will assume that Rule 12(b)(1) applies.  *See Future Care Consultants, LLC v. Connolly*, Civil No. 17-2552 (RMB/AMD), 2018 WL 1069414, at *3 (D.N.J. Feb. 26, 2018); *Acceleration Bay LLC v. Activision Blizzard, Inc.*, Civil Action Nos. 15-228-RGA, 15-282-RGA, 15-311-RGA, 2016 WL 3186890, at *5 (D. Del. June 3, 2016).  But its analysis would be little different if Rule 12(b)(6) applied instead.  That is because under Rule 12(b)(1), Defendants' argument for dismissal here would rightly be characterized as a facial challenge to subject matter jurisdiction—since Defendants do not ask the Court to consider or rely on any facts other than those in the FAC or in the exhibits attached thereto (such as the SPA).  (D.I. 43 at 7-10 (Plaintiff pointing only to the FAC and the SPA in making its arguments

regarding standing)); *see also Harrison*, 320 F. Supp. 3d at 611; *Future Care*, 2018 WL

1069414, at \*3; *TSMC Tech., Inc. v. Zond, LLC*, Civil Action No. 14-721-LPS-CJB, 2014 WL

7498398, at \*3 (D. Del. Jan. 8, 2014).  And a facial challenge to jurisdiction under Rule 12(b)(1)

does not materially differ from the inquiry that a court conducts on a Rule 12(b)(6) motion; in

both cases, the well-pleaded factual allegations are afforded the presumption of truth.  *Harrison*,

320 F. Supp. 3d at 611; *Future Care*, 2018 WL 1069414, at \*3.

       The Court now turns to the merits.  In the FAC, Plaintiff attempted to pre-empt this

standing issue by repeatedly alleging that:  (1) ZNHC assigned its rights under the SPA and the

Stock Pledge Agreement to Zausner; and (2) Zausner is the successor-in-interest by merger to

ZNHC.  (D.I. 39 at ¶¶ 4, 131, 146, 147, 158, 159, 160)  Defendants, however, argue that these

allegations are insufficient to remedy a standing problem.  With regard to Plaintiff's allegation

that ZNHC assigned its rights in the SPA to Zausner, Defendants retort that there is an anti-

assignment provision in Section XII.4 of the SPA—and that this provision renders null and void

any rights that Zausner might claim to have obtained via an assignment.  (D.I. 43 at 8)  The

relevant portion of that provision is excerpted below (with the portion that Defendants focus on

noted in italics):

> This Agreement shall be binding upon, and inure to the benefit of,
> the parties hereto and their respective successors, heirs, legal
> representatives and permitted assigns.  *Neither party may directly
> or indirectly assign any of its rights or delegate any of its
> obligations under this Agreement by operation of law or otherwise,
> without the prior written consent of the other party.  Any purported
> direct or indirect assignment in violation of this Section shall be
> null and void ab initio*. . . .

(SPA at § XII.4 (emphasis added))  And with regard to Plaintiff's allegation that ZNHC became

Zausner due to a merger (i.e., that Zausner is ZNHC's successor-in-interest via the merger),

Defendants argue that under Delaware law,[4] after a merger, the transfer of any rights from a predecessor to a surviving entity is considered to be an assignment of rights "by operation of law" (and thus, is not effective here in light of the above-italicized terms of the anti-assignment provision). (D.I. 43 at 8 (citing *MTA Canada Royalty Corp. v. Compania Minera Pangea, S.A. de C.V.*, C.A. No.: N19C-11-228 AML, 2020 WL 5554161 (Del. Super. Ct. Sept. 16, 2020))

In response, Plaintiff offers a number of reasons why Defendants' standing arguments miss the mark. (D.I. 44 at 3-7) But the Court need only address one of them here. That is Plaintiff's argument that in the portion of Section XII.4 that Defendants quote from, they ignore the first sentence, which states: "This Agreement *shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors,* heirs, legal representatives and permitted assigns." (SPA at § XII.4 (emphasis added)) In the Court's view, this sentence makes it very clear that ZNHC's successor-by-merger, Zausner,[5] has the full right to seek to enforce the SPA's provisions (including the right to payment from ECB/AVC), since those provisions "inure[d] to [Zausner's] benefit" when it succeeded ZNHC. (*Id.*) And that is exactly what Zausner is seeking to do via this lawsuit. Moreover, Section XII.4's first sentence leaves little doubt that the SPA considers a party's "successors" to be a different category of entity than a party's "permitted assigns." "Permitted assigns" are able to enjoy the benefits of the SPA, but only if

---

[4]     Defendants do not explain why Delaware law would be relevant to this issue, as opposed to federal law or Florida state law (the SPA has a Florida choice-of-law provision). (SPA at § XII.5; D.I. 44 at 4) In light of the Court's decision though, it would not matter what law applies to this standing question; the decision would surely be the same regardless.

[5]     There surely can be no dispute that Plaintiff has plausibly alleged that Zausner was ZNHC's successor-in-interest. Not only does Plaintiff repeatedly assert that to be so in the FAC, (D.I. 39 at ¶¶ 4, 131, 146, 158), but in the Related Litigation, ECB and AVC allege the same (and then use Zausner's status as successor to ZNHC as a basis to allege that Zausner is liable for breach of the SPA). (D.I. 44 at 5 (citing Related Action, D.I. 77 at 1; *id.*, D.I. 147 at 1 & ¶ 7))

they are "permitted" to do so via consent from the other parties to the SPA.  But "successors" do not need to get this "permi[ssion]" in order to enjoy the SPA's fruits—since in the first sentence of Section XII.4, the parties explicitly agreed that a successor necessarily enjoys those very rights from the start.

Defendants claim that reading the first sentence of Section XII.4 in this way would render the next two sentences of the anti-assignment provision "useless or inexplicable."  (D.I. 47 at 2 (internal quotation marks and citation omitted))  In other words, Defendants argue that:  (1) when the anti-assignment provision is referring to the assignment of rights "by operation of law" it must be referring to a scenario where rights transfer from a predecessor entity to a surviving entity by merger; (2) the anti-assignment provision says that assignment of rights "by operation of law" do not take effect without the prior written consent of the other party to the SPA, so (3) Plaintiff's reading of the provision (which would not require such written consent in such a scenario) must be wrong.  Defendants' logic rests on the assumption that the provision's reference to assignment "by operation of law" can *only* be referring to an assignment-via-merger-type scenario.  Yet the Court does not see why that is so.  There could well be other ways—in addition to a merger—that a party could be said to have assigned its rights under the SPA "by operation of law."  That might happen, by way of just one example, via the transfer of property from a debtor to a bankruptcy estate in a bankruptcy proceeding.  *Cf. King v. Ind. Harbor Belt R.R. Co.*, Case No. 2:15-CV-245 JD, 2018 WL 1566821, at *2 (N.D. Ind. Mar. 30, 2018) ("At the time a debtor files a bankruptcy petition, the debtor's property, by operation of law, becomes part of the bankruptcy estate whether properly disclosed or not."); *In re Ordonez*, Bankruptcy Number: 10-37596, 2018 WL 1135498, at *4 (Bankr. D. Utah Feb. 28, 2018) ("The Debtor's legal claims in the Lawsuit are property.  When she filed bankruptcy, those legal claims

became part of the bankruptcy estate, along with all other 'legal or equitable interests of the debtor in property.'[]  This transfer of the Debtor's property into the bankruptcy estate is done by operation of law, specifically the Bankruptcy Code.").

For these reasons, the Court concludes that Plaintiff has withstood Defendants' facial challenge to standing here, pursuant to Rule 12(b)(1).

## B.     Personal Jurisdiction

Next, Defendants argue that all of the claims against the Individual Defendants should be dismissed for lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2). (D.I. 43 at 10-14)  In support of this argument, the Individual Defendants filed declarations stating that they never transacted any business in, performed any work in or engaged in any conduct directed to the State of Delaware, and otherwise have no meaningful contacts with the state.  (D.I. 43, ex. A)

Below, the Court will first set out the legal standard regarding a Rule 12(b)(2) challenge. Then it will turn to the merits.

### 1.     Legal Standard

Rule 12(b)(2) directs courts to dismiss a case when the court lacks personal jurisdiction over the defendant.  When a defendant moves to dismiss a lawsuit for lack of personal jurisdiction, the plaintiff bears the burden of showing the basis for jurisdiction.  *Power Integrations, Inc. v. BCD Semiconductor Corp.*, 547 F. Supp. 2d 365, 369 (D. Del. 2008).  To satisfy its burden, the plaintiff must produce "'sworn affidavits or other competent evidence,'" since this type of Rule 12(b)(2) motion "'requires resolution of factual issues outside the pleadings.'"  *Marnavi S.p.A. v. Keehan*, 900 F. Supp. 2d 377, 385 (D. Del. 2012) (quoting *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 67 & n.9 (3d Cir. 1984)); *see also*

*Perlight Solar Co. Ltd. v. Perlight Sales N. Am. LLC*, C.A. No. 14-331-LPS, 2015 WL 5544966, at *2 (D. Del. Sept. 18, 2015).  In a case like this one, where a district court has not held an evidentiary hearing, the plaintiff must only make a *prima facie* showing that personal jurisdiction exists.  *See Perlight Solar*, 2015 WL 5544966, at *2; *Hardwire, LLC v. Zero Int'l, Inc.*, Civil Action No. 14-54-LPS-CJB, 2014 WL 5144610, at *5 (D. Del. Oct. 14, 2014).  To do so, the plaintiff must establish with reasonable particularity sufficient contacts between the defendant and the forum state.  *Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992).  All factual inferences to be drawn from the pleadings, affidavits and exhibits must be drawn in the plaintiff's favor at this stage.  *Hardwire*, 2014 WL 5144610, at *5 (citing cases); *Power Integrations*, 547 F. Supp. 2d at 369.

In order to establish personal jurisdiction, a plaintiff typically must adduce facts sufficient to satisfy two requirements—one statutory and one constitutional.  *Perlight Solar*, 2015 WL 5544966, at *2; *Hardwire*, 2014 WL 5144610, at *6.  First, the Court must consider whether the defendant's actions fall within the scope of Delaware's long-arm statute.  *Hardwire*, 2014 WL 5144610, at *6; *see also Power Integrations*, 547 F. Supp. 2d at 369.  Second, the Court must determine whether the exercise of jurisdiction comports with the defendant's right to due process.  *Hardwire*, 2014 WL 5144610, at *6; *Power Integrations*, 547 F. Supp. 2d at 369 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Due process is satisfied where the court finds that "certain minimum contacts" exist between the defendant and the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted).

## 2.     Discussion

Plaintiff asserts that this Court has personal jurisdiction over the Individual Defendants on multiple grounds.  (*See, e.g.*, D.I. 44 at 2)  First, Plaintiff contends that the Individual Defendants are bound by the Delaware forum selection clauses in the SPA (Section XII.5) and Amendment No. 1 (paragraph 9).  Second, Plaintiff argues that the Court has jurisdiction under Delaware's long-arm statute.   Third, Plaintiff asserts that the Court can exercise jurisdiction pursuant to the conspiracy doctrine of personal jurisdiction.  Fourth and finally, Plaintiff points to the alter ego theory as warranting the exercise of this Court's jurisdiction.

For the reasons discussed below, the Court finds that plaintiff has failed to make a *prima facie* showing that personal jurisdiction exists with respect to each of these theories.

### a.        The SPA and Amendment No. 1's Forum Selection Clauses

When a party enters into an agreement that contains a valid forum selection clause, the party is considered to have expressly consented to personal jurisdiction in the relevant jurisdiction.  *See, e.g.*, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985); *ECB USA, Inc. v. Savencia, S.A.*, Civil Action No. 19-731-RGA-CJB, 2020 WL 11762200, at *7 (D. Del. July 10, 2020).[6]  Delaware courts have found that a non-signatory to an agreement can be bound by the agreement's forum selection clause where three elements are satisfied:  (1) the forum selection clause is valid; (2) the non-signatory is a third-party beneficiary of the agreement or is closely related to the agreement; and (3) the claim against the non-signatory arises from the non-signatory's status relating to the agreement.  *Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA*,

---

[6]        If a defendant has expressly consented to a court's jurisdiction pursuant to a forum selection clause, then the court is not required to undertake a separate due process "minimum contacts" analysis.  *Truinject Corp. v. Nestle Skin Health, S.A.*, C.A. No. 19-592-LPS-JLH, 2019 WL 6828984, at *8 (D. Del. Dec. 13, 2019) (citing cases).

779 F.3d 214, 218 (3d Cir. 2015) (citing Delaware law); *Truinject Corp. v. Nestle Skin Health, S.A.*, C.A. No. 19-592-LPS-JLH, 2019 WL 6828984, at *11 (D. Del. Dec. 13, 2019) (same).[7] Plaintiff asserts that these elements are met here, that the Individual Defendants are therefore bound by the forum selection clauses, and that the Court thus has personal jurisdiction as to the Individual Defendants.  (D.I. 44 at 7-9)

As to this issue, the parties dispute only whether the second element of the above-referenced test is satisfied.[8]  On that front, Plaintiff's theory is that the Individual Defendants are "closely related" to both the SPA and Amendment No. 1.  (*Id.* at 8)  The "closely related" test is an application of equitable estoppel, serving to "prevent a non-signatory from embracing a contract, and then turning its back on the portions of the contract . . . that it finds distasteful."  *Truinject Corp.*, 2019 WL 6828984, at *12 (internal quotation marks and citation omitted); *Neurvana Med., LLC v. Balt USA, LLC*, C.A. No. 2019-0034-KSJM, 2019 WL 4464268, at *3 (Del. Ch. Sept. 18, 2019) (internal quotation marks and citation omitted).  Pursuant to Delaware law, there are two ways that an entity can be closely related to an agreement:  (1) it received a direct benefit (which can be pecuniary or non-pecuniary) from the agreement; or (2) it was

---

[7]      The parties did not explicitly address whether state or federal law applies here to the question of whether a forum selection clause binds a non-signatory to an agreement.  In their briefs, both sides cite to cases from the federal courts as well as from Delaware state courts in support of their positions.  (D.I. 44 at 8-9; D.I. 47 at 7-9)  The United States Court of Appeals for the Third Circuit has explained that a court should utilize state law in assessing this issue (unless the parties have agreed otherwise).  *In re McGraw-Hill Global Educ. Holdings LLC*, 909 F.3d 48, 58-59 (3d Cir. 2018).  Thus, the Court will apply Delaware law (as it has been applied by both Delaware state courts and federal courts) to this issue, just as the parties often do in their briefing.  (Delaware state law also applies to the remaining issues addressed in this personal jurisdiction subsection of the Report and Recommendation.).

[8]      The Individual Defendants do not dispute that the first and third elements of the test are met.  (D.I. 44 at 8, 9; D.I. 47 at 7-9)

foreseeable that the non-signatory would be bound by the agreement. *Truinject Corp.*, 2019 WL 6828984, at *12; *Neurvana Med., LLC*, 2019 WL 4464268, at *4.[9]

The Court first takes up the "direct benefit" prong of the "closely related" test. Plaintiff argues that the Blandins received a direct benefit from the SPA and Amendment No. 1 because: (1) they own and operate ECB and AVC; (2) they were officers and/or directors of these companies; and (3) post-closing, they were officers and/or directors of SFI. (D.I. 44 at 8) As for Leoni, Plaintiff asserts that he received a direct benefit by later becoming CEO of SFI in 2017 and by being awarded a 2% ownership stake in AVC after the closing of the SPA. (*Id.*) Additionally, according to Plaintiff, all Individual Defendants benefitted personally "from the conspiracy through which they sold assets of SFI and refused to pay the [Subsequent Installments]." (*Id.*) The Court is not persuaded.

Delaware state courts have explained that for the "direct benefit" test to be satisfied, a non-signatory "must actually receive a benefit under or by way of the contract." *Sustainability Partners LLC v. Jacobs*, C.A. No. 2019-0742-SG, 2020 WL 3119034, at *6 (Del. Ch. June 11,

---

[9]   As an initial matter, the Individual Defendants point out that some courts have raised constitutional concerns in a scenario like this (i.e., when a court is asked to utilize the "closely related" test in order to find personal jurisdiction over a non-signatory to an agreement containing a forum selection clause), were a court to find personal jurisdiction without engaging in a further due process minimum contacts analysis. (D.I. 47 at 5-7 (citing *Truinject Corp.*, 2019 WL 6828984, at *11)) This concern seems especially relevant in cases where the non-signatory was not aware of or involved in the negotiations leading up to the execution of the relevant agreement. *See Truinject Corp.*, 2019 WL 6828984, at *10-11; *Finjan LLC v. Trustwave Holdings, Inc.*, C.A. No. 20-371-LPS, 2021 WL 5051147, at *9 (D. Del. Oct. 29, 2021) ("Other cases have cautioned against extending personal jurisdiction to a non-signatory based on a forum selection clause alone, noting that the strength of the 'consent' in this circumstance is undermined by the absence of negotiations involving the non-signatory."). Here, the Blandins were allegedly involved in the negotiations regarding the acquisition of SFI, and all Individual Defendants were alleged to have been involved in the negotiations regarding Amendment No. 1. (D.I. 39 at ¶¶ 32, 44-46; SPA at 77; D.I. 39, ex. 2 at 6) Nevertheless, because the Court does not find either prong of the closely related test to be met here, it need not further delve into this particular issue.

2020) (emphasis omitted).  Such a benefit has been found to have been received in cases where, for example, the non-signatories "received direct benefits from the contracts like permitted stock transfers,[] lucrative leases,[] a seat on a board of directors,[] or cash." *Id.*  When examining whether a non-signatory is "closely related" to an agreement, the court generally looks to the parties' conduct after the agreement was executed.  *Eastman v. Chem. Co. v. AlphaPet Inc.*, Civ. Action No. 09-971-LPS-CJB, 2011 WL 6004079, at *9 (D. Del. Nov. 4, 2011).

As an initial matter, Plaintiff does not elaborate on how the Blandins' ownership and operation of ECB and AVC, or their roles as officers and/or directors of these companies, resulted in the Blandins' receipt of a direct benefit pursuant to the terms of the SPA and/or Amendment No. 1.  The FAC does not allege that the terms of the SPA or Amendment No. 1 made any reference to the Blandins' connections to ECB and AVC, nor that those connections were somehow required by or directly flowed from the agreements.  (*See* D.I. 47 at 9)  Indeed, the allegations are that the Blandins' relationships with ECB and AVC were established prior to the SPA's closing.  (*See, e.g.*, D.I. 39 at ¶¶ 8, 23, 45)  Thus, this particular theory fails.  *See, e.g.*, *Partners & Simons, Inc. v. Sandbox Acquisitions, LLC*, C.A. No. 2020-0776-MTZ, 2021 WL 3161651, at *6 (Del. Ch. July 26, 2021) (rejecting the plaintiff's argument that the non-signatory received a direct benefit under the agreement due to his role as the sole manager and board member of the company being sold, where the complaint alleged that the non-signatory was appointed to those positions via an independent contractual right before the relevant agreement's terms were finalized).

The Court next turns to Plaintiff's assertion that the Individual Defendants derived a direct benefit from the SPA and Amendment No. 1 because they all became directors/officers of SFI following the acquisition (and that Leoni was awarded a 2% ownership in AVC following

the acquisition or by later becoming SFI's CEO).  (D.I. 44 at 8; *see also* D.I. 39 at ¶¶ 65, 75, 87)

However, the terms of the contracts at issue do not expressly require that the Individual

Defendants must obtain these benefits after the SPA's closing.  (D.I. 47 at 9)  Nor is there any

allegation that these benefits were otherwise a necessary result of the execution of the contracts.

Instead, they are simply events that happened to occur after the SPA and Amendment No. 1 were

signed.  To be sure, they are events that can be linked back in some way to the signing of the

agreements:  i.e., "First, the agreements were signed.  Once the agreements were signed, then the

Blandins indirectly owned SFI.  Once the Blandins indirectly owned SFI, then they had the

ability to have themselves appointed as officers/directors.  Thereafter, at some point they did so."

But this kind of "one-thing-happened-and-then-another-thing-happened-and-then-another-thing-

happened" type of allegation is too far removed from the terms of or the direct effect of the

contracts at issue—such that it cannot pass the "direct benefit" test.  *See, e.g.*, *Phunware, Inc. v.*

*Excelmind Grp. Ltd.*, 117 F. Supp. 3d 613, 629-30 (D. Del. 2015) (rejecting the plaintiffs'

argument that a non-signatory was closely related to the agreement, where a letter of intent

setting forth the material terms for an acquisition identified the non-signatory as the major holder

of the stock that was the principal asset transferred in the transaction governed by the agreement,

because any benefit the non-signatory would receive through its status as the major holder of the

stock would be an indirect benefit); *Eastman Chem. Co.*, 2011 WL 6004079, at *10-12 (finding

that the plaintiff was not entitled to jurisdictional discovery on the ground that a non-signatory

corporate parent was closely related to the agreement at issue, where the plaintiff simply pointed

to "the general, indirect benefits that a parent corporation might receive from any transaction involving their subsidiary").[10]

Finally, with respect to Plaintiff's cursory assertion that the Individual Defendants directly benefitted from the agreement in light of "the conspiracy through which they sold assets of SFI and refused to pay the [Subsequent Installments,]" (D.I. 44 at 8), the Court also does not see how this could constitute a benefit flowing directly from the relevant agreements. Instead, this would seem to be a benefit that flows from a later alleged *breach* of the agreements. *See BAM Int'l, LLC v. MSBA Grp. Inc.*, C.A. No. 2021-0181-SG, 2021 WL 5905878, at *12 (Del. Ch. Dec. 14, 2021) (noting that the "receipt of the allegedly purloined funds by the Moving Defendants would not be a benefit from the contract, but from the *breach* of the contract") (emphasis in original).

Thus, Plaintiff has not established a *prima facie* showing that Individual Defendants have received a direct benefit from the SPA and Amendment No. 1, such that they could be bound by the forum selection clauses therein.

_____

[10]     The cases that Plaintiff cites do not compel a different conclusion. (D.I. 44 at 8; D.I. 47 at 8)  In *Baker v. Impact Holding, Inc.*, Civil Action No. 4960-VCP, 2010 WL 1931032 (Del. Ch. May 13, 2010), the Delaware Court of Chancery found that a non-signatory to an agreement was bound by a forum selection clause because he was closely related to the agreement, where, *inter alia*, the agreement "expressly" provided the non-signatory with a seat on the board of directors of a company, thus constituting a direct benefit to the non-signatory. 2010 WL 1931032, at *1, *4.  And in *Cap. Grp. Cos., Inc. v. Armour*, No. Civ.A. 422-N, 2004 WL 2521295 (Del. Ch. Nov. 3, 2004), the non-signatory and her spouse transferred stock to a trust and, in doing so, signed a joinder agreement in which they agreed to be bound by the subject contract. *Id.* at *1-2.  The Court of Chancery explained that by putting the stock in trust, the non-signatory gained a beneficial interest in the stock, and that the trust had to agree to the contract at issue in order for the stock to be transferred; thus the execution of the contract provided the non-signatory with a direct benefit. *Id.* at *7.  Although Plaintiff curiously characterizes this case as one in which a "former CEO was bound by a forum selection clause even though she was not a party to the contract[,]" (D.I. 44 at 8), those are not the actual facts of the case.

The second way that a plaintiff can demonstrate that a non-signatory is closely related to an agreement is through the foreseeability prong.  Delaware courts have explained that where, as here, foreseeability must be a standalone basis for finding a non-signatory to be closely related to an agreement, the prong has been—and should be—narrowly applied in only two scenarios:  "(1) when non-signatory *defendants* sought to enforce a forum selection clause, and the signatory *plaintiffs* sought to avoid it by arguing the non-signatory defendants lacked standing under the contract.;[] and (2) when a controlled entity is subject to a forum selection clause agreed to by its controller and the controlled entity bears a clear and significant connection to the subject matter of the agreement."  *Sustainability Partners LLC*, 2020 WL 3119034, at *7 (internal quotation marks and citation omitted) (emphasis in original); *Neurvana Med., LLC*, 2019 WL 4464268, at *5-6; *see also Truinject Corp.*, 2019 WL 6828984, at *13.  These courts have explained that if one of those two circumstances is not at play, then even if the non-signatory was actively involved in negotiating the relevant agreement, that fact (standing alone) cannot satisfy the foreseeability inquiry; this is because such a theory would generally entail rejecting principles of corporate separateness, which in turn results in uncertainty for participants in transactions. *Sustainability Partners LLC*, 2020 WL 3119034, at *7; *Neurvana Med., LLC*, 2019 WL 4464268, at *6-8; *see also, e.g.*, *Partners & Simons, Inc.*, 2021 WL 3161651, at *6-8 ("More generally, expanding the foreseeability test to reach Krawetz as the human decisionmaker for the signatory entity would clash with and erode the general rule that individuals who sign agreements on behalf of the corporate entities they represent are not personally bound by forum selection clauses in those agreements").[11]

---

[11]    It makes sense that there are only a cabined number of scenarios in which the direct benefit prong or the foreseeability prong of the "closely related" test can be met, pursuant to Delaware law.  After all, these analyses occur where a party is asking the court to find that its

Here, the Individual Defendants are not seeking to enforce the forum selection clause against Plaintiff.  Nor is this a situation where the signatories to the agreements are attempting to manipulate "an end-run around the forum selection [clauses]" so as to avoid personal jurisdiction as to the companies they control.  *Neurvana Med., LLC*, 2019 WL 4464268, at *5.  Instead, Plaintiff's sole argument is that it was reasonably foreseeable that the Individual Defendants would be bound by the SPA and Amendment No. 1 because:  (1) they were "intimately involved" with the negotiations and purchase of SFI (as well as with subsequent events relating to the company); and (2) two of them (Claude Blandin, who signed the SPA and Amendment No. 1 on behalf of ECB) and Bruno Blandin (who was ECB's designated signatory on the Stock Pledge Agreement) signed the agreements.  (D.I. 44 at 9; *see also* SPA at 77; Stock Pledge Agreement at 9; D.I. 39, ex. 2 at 6)  But as noted above, mere "active involvement" in the negotiations, standing alone, cannot satisfy this prong.  *See Partners & Simons, Inc.*, 2021 WL 3161651, at *6-9.

In sum, Plaintiff has failed to make a *prima facie* showing that the Individual Defendants are "closely related" to the SPA and/or Amendment No. 1; thus, the Individual Defendants are not bound by the forum selection clauses in these agreements.

### b.    Delaware Long-arm Statute

Next, Plaintiff argues that the Individual Defendants are subject to personal jurisdiction in Delaware under subsection (c)(1) of the Delaware long-arm statute.  (D.I. 44 at 10-13)  This

---

adversary should be bound by a forum selection clause in a contract—a contract as to which the adversary was not in fact a party.  In those circumstances, in order for it to be said that there is personal jurisdiction over the adversary, it needs to be *very clear* that the adversary would have expected to be, or intended to be, bound by the forum selection clause.  Were this not so, the concept of purposeful availment that is so central to a finding of personal jurisdiction would be seriously diluted.  *See Neurvana Med., LLC*, 2019 WL 4464268, at *5-6; *cf. Guaranteed Rate, Inc. v. Conn*, 264 F. Supp. 3d 909, 926 (N.D. Ill. 2017).

subsection provides that a court may exercise personal jurisdiction over any nonresident who "[t]ransacts any business or performs any character of work or service in the State[.]" Del. Code Ann. tit. 10, § 3104(c)(1) ("Section 3104(c)(1)").[12]

According to Plaintiff, it has set out many allegations relating to the Individual Defendants' "business transactions in Delaware which caused harm to [Plaintiff] in Delaware[,]" and that in turn bring the Individual Defendants within Section 3104(c)(1)'s ambit. (D.I. 44 at 10) More specifically, Plaintiff points to the following allegations:

- The Individual Defendants negotiated the acquisition of SFI, a Delaware corporation, and the terms of the SPA and Stock Pledge Agreement, (id. at 10-11 (citing D.I. 39 at ¶¶ 45-56));

- The Individual Defendants, post-closing, served as officers/directors of SFI and were involved in the day-to-day management of SFI, (id. at 11 (citing D.I. 39 at ¶¶ 8-12, 65-97));

- The Individual Defendants negotiated other contracts on behalf of SFI, including entering into a Distribution Agreement with a Delaware company, (id. (citing D.I. 39 at ¶ 28));

- The Individual Defendants negotiated with ZNHC and Plaintiff, both of which are Delaware corporations, with respect to Amendment No. 1, (id. (citing D.I. 39 at ¶¶ 57-64)); and

- The Individual Defendants had extensive business relationships with two other Delaware corporations, Deloitte Transactions and Business Analytics LLP and Wells Fargo Capital Finance in connection with SFI, (id. (citing D.I. 39 at ¶¶ 17-18, 22, 33-34, 81-92)).

---

[12]    Delaware's long-arm statute "is to be broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause." *Hercules Inc. v. Leu Tr. & Banking (Bah.) Ltd.*, 611 A.2d 476, 480 (Del. 1992). The relevant subsections of the long-arm statute here (Section 3104(c)(1), as well Section 3104(c)(3), which is further discussed below) are specific jurisdiction provisions, which require that the cause of action arise from the defendant's conduct in the forum state. *Smith v. Tipsord*, Civ. No. 20-852-LPS, 2021 WL 4195791, at *3 (D. Del. Sept. 15, 2021); *Shoemaker v. McConnell*, 556 F. Supp. 2d 351, 354 (D. Del. 2008).

These allegations fail to establish a sufficient basis for jurisdiction under Section 3104(c)(1). That is because none of them provide any suggestion that the Individual Defendants have transacted business *in Delaware*. (D.I. 43 at 11-12; D.I. 47 at 10) Individual Defendants' acquisition of a Delaware corporation (headquartered outside of the state) does not amount to transacting business within the meaning of Section 3104(c)(1). *Estate of Daher v. LSH CO.*, C.A. No. 20-360-LPS-JLH, 2021 WL 184394, at *6 (D. Del. Jan. 19, 2021); *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 439 (Del. 2005). Nor does serving as an officer or director of a Delaware entity, absent some relevant act (not alleged here) that actually occurs in Delaware. *See, e.g.*, *LVI Grp. Invs. LLC .v NCM Grp. Holdings, LLC*, Civil Action No. 12067-VCG, 2017 WL 3912632, at *4 (Del. Ch. Sept. 7, 2017); *Ruggiero v. FuturaGene, plc*, 948 A.2d 1124, 1134 (Del. Ch. 2008). And contracting with or transacting business with a Delaware corporation is insufficient to support personal jurisdiction, absent facts (not alleged here) that, at a minimum, establish that the performance of the contract/transaction took place in Delaware. *See, e.g.*, *Seiden for S. China Livestock, Inc. v. Schwartz, Levitsky, & Feldman LLP*, C.A. No. 17-1869 (MN), 2018 WL 5818540, at *5 (D. Del. Nov. 7, 2018); *Phunware, Inc.*, 117 F. Supp. 3d at 630-31. These allegations, then, coupled with the Individual Defendants' unrebutted declarations establishing that they have never transacted business in Delaware, (D.I. 43, ex. A), make it clear that Section 3104(c)(1) cannot provide a basis for personal jurisdiction as to the Individual Defendants.[13]

---

[13]    The cases that Plaintiff cites in support of its argument to the contrary do not compel a different conclusion. (D.I. 44 at 12-13) In *Univ. Cap. Mgmt., Inc. v. Micco World, Inc.*, No. 10C-07-039 RRC, 2011 WL 2347612 (Del. Super. Ct. June 2, 2011), the allegations established actual relevant acts occurring in Delaware, including that the plaintiff provided management services to the corporate defendant (and to the corporate defendant's predecessor company) from Delaware and that two of the individual defendants traveled to Delaware and met with plaintiff there prior to entering into the contracts at issue. 2011 WL 2347612, at *1-2, *5-6.

c.      **Conspiracy Doctrine**

Plaintiff next asserts that the Court has personal jurisdiction over the Individual

Defendants pursuant to the conspiracy doctrine.  (D.I. 44 at 13-14)[14]  With this doctrine, a court

may exercise personal jurisdiction over non-residents based on the forum contacts of their co-

conspirators. *Instituto Bancario Italiano v. Hunter Eng'g Co.*, 449 A.2d 210, 222 (Del. 1982).

However, this theory requires the plaintiff to demonstrate, *inter alia*, that a substantial act or

substantial effect in furtherance of the conspiracy occurred *in Delaware*.  *Id.* at 225; *see also,*

*e.g.*, *Altabef v. Neugarten*, Civil Action No. 2021-0117-MTZ, 2021 WL 5919459, at *8 (Del. Ch.

Dec. 15, 2021) ("A conspiracy is not an independent jurisdictional hook:  there must still be an

anchoring Delaware act.").

In its briefing, Plaintiff contends that the Individual Defendants and their alleged co-

conspirators ECB and AVC together engaged in a conspiracy to avoid paying the Subsequent

Installments due to Plaintiff, and that the acts of ECB and AVC can be attributed to the

Individual Defendants for jurisdictional purposes.[15]  (D.I. 44 at 14)  In attempting to make out

---

And in *Kahn v. Lynch Commc'n Sys., Inc.*, CIVIL ACTION No. 8748, 1989 WL 99800 (Del. Ch.
Aug. 24, 1989), the court found that the defendant was subject to personal jurisdiction pursuant
to Section 3104(c)(1) where it was directly involved in the wrongful conduct that resulted in a
merger at issue between a Delaware corporation and the defendant's subsidiary.  1989 WL
99800 at *1, *4; *see also Sample v. Morgan*, 935 A.2d 1046, 1057 n.42 (Del. Ch. 2007)
(explaining that the merger in *Kahn* constituted the transaction of business within the meaning of
Section 3104(c)(1) because "the merger's consummation required a filing with the [Delaware]
Secretary of State").

[14]      In making its argument as to why there is personal jurisdiction under the
conspiracy doctrine, Plaintiff points not only to Section 3104(c)(1), but also to Section
3104(c)(3) of the long-arm statute.  (D.I. 44 at 13)  Section 3104(c)(3) allows the court to
exercise jurisdiction over a nonresident defendant when that person "[c]auses tortious injury in
the State by an act or omission in this State[.]"  Del. Code Ann. tit. 10, § 3104(c)(3).

[15]      It is not disputed that ECB and AVC have clearly consented to jurisdiction in this
Court.  (D.I. 44 at 14; D.I. 47 at 7 n.3)

the requisite connection to Delaware, Plaintiff simply states that "the conspiracy produced a significant effect in Delaware:  the deliberate non-payment of the [Subsequent Installments] owed to Zausner, a Delaware corporation."  (*Id.*)  But this argument ignores the fact that Plaintiff's principal place of business is in Pennsylvania.  (D.I. 39 at ¶ 1)  Therefore, non-payment of money due to Plaintiff (which, had it been paid, would have inured to Plaintiff's benefit in Pennsylvania) is not a sufficient anchoring act in Delaware to confer jurisdiction under the conspiracy doctrine.  (D.I. 47 at 10); *see Ninespot, Inc. v. Jupai Holdings Ltd.*, Civil Action No. 18-144-RGA, 2018 WL 3626325, at *6 (D. Del. July 30, 2018) (explaining that "the Delaware Long-Arm Statute does not provide for jurisdiction over defendants who enter into a contract with a Delaware corporation and subsequently cause harm by breaching the contract, when the harm does not occur in the state"); *Turf Nation, Inc. v. UBU Sports, Inc.*, C.A. No.: N17C-01-271 EMD CCLD, 2017 WL 4535970, at *10 (Del. Super. Ct. Oct. 11, 2017) ("Moreover, Turf Nation's complained of injury in Delaware—harm occurring in Delaware because UBU and Turf Nation are Delaware corporations—did not occur in Delaware such as would support the exercise of specific jurisdiction.").

### d.    Alter Ego Theory

Finally, Plaintiff argues that the Court has personal jurisdiction over the Individual Defendants pursuant to an alter ego theory, based on Plaintiff's allegations that the Individual Defendants are alter egos of C2B, ECB and AVC.  (D.I. 44 at 14-15)  Delaware courts have "rather strictly" applied the alter ego theory of personal jurisdiction, using an analysis similar to that used in determining whether to pierce the corporate veil.  *Fidelity Nat'l Info. Servs., Inc. v. Plano Encryption Techs., LLC*, Civil Action No. 15-777-LPS-CJB, 2016 WL 1650763, at *4 (D. Del. Apr. 25, 2016) (internal quotation marks and citations omitted).  Moreover, application of

this theory in the personal jurisdiction context, requires, *inter alia*, "the existence of acts *in Delaware* which can be fairly imputed to the out-of-state defendant and which satisfy the long-arm statute and/or federal due process requirements." *Altabef*, 2021 WL 5919459, at *11 (emphasis added); *see also CLP Toxicology, Inc. v. Casla Bio Holdings LLC*, C.A. No. 2018-0783-PRW, C.A. No. N18C-10-332 PRW CCLD, 2020 WL 3564622, at *13 & n. 101 (Del. Ch. June 29, 2020).

Plaintiff does not even attempt to explain how this requirement of the alter ego theory is satisfied here.  (D.I. 44 at 15)  As discussed above, it has not identified a single relevant act related to its allegations of wrongdoing that occurred in Delaware.  Thus, for at least this reason, Plaintiff's reliance on the alter ego theory of jurisdiction also fails.  (D.I. 43 at 13; D.I. 47 at 10)

### 3.    Conclusion

For the above reasons, Plaintiff has not made a *prima facie* showing of personal jurisdiction as to the Individual Defendants.  Therefore, the Court recommends that the Motion be granted as to the claims against the Individual Defendants.[16]

---

[16]    Notwithstanding Plaintiff's assertion that it sufficiently made out a *prima facie* showing of personal jurisdiction, Plaintiff also filed an "alternative motion" seeking to conduct jurisdictional discovery.  (D.I. 45)  As noted above, the Court has determined that Plaintiff has not in fact made out its *prima facie* showing.  With regard to the forum selection clause issue, the Court's decision largely turned on a legal analysis as to why the "closely related" doctrine does not apply here.  As to the other purported bases for personal jurisdiction, the decision rested on the fact that there is just no evidence at all to suggest that the Individual Defendants ever performed a relevant act in Delaware.

In a prior decision, the Court has explained why, pursuant to the applicable law of the Third Circuit, if a party has not made out a *prima facie* showing of personal jurisdiction, then the party is not entitled to take jurisdictional discovery.  *See 3G Licensing, S.A. v. Lenovo Grp. Ltd.*, Civil Action No. 17-84-LPS, 2019 WL 3974539, at *8-9 (D. Del. Aug. 22, 2019), *report and recommendation adopted*, Civil Action No. 17-84-LPS, 2019 WL 7635823 (D. Del. Sept. 19, 2019) (citing cases); *cf. CLP Toxicology, Inc.*, 2020 WL 3564622, at *15.  Put differently, and contrary to Plaintiff's argument, (D.I. 52 at 1-2, 7, 9), the relevant law does not allow for a scenario where a party has failed to make out a *prima facie* showing of personal jurisdiction, but

24

### C.      Failure to State a Claim

Defendants next argue that in the FAC, Plaintiff fails to state a claim as to each of its causes of action, such that those claims should be dismissed pursuant to Rule 12(b)(6).  (D.I. 43 at 15-19)

The sufficiency of pleadings for non-fraud claims is governed by Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  When presented with a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court conducts a two-part analysis.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  First, the court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions."  *Id.* at 210-11.  Second, the court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  In assessing the plausibility of a claim, the court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Id.* at 210 (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

Below, the Court addresses Defendants' arguments as to the respective claims in turn.[17]

### 1.      The Contract Claims (Counts I, II, III and IV)

---

still somehow has made out a sufficient showing to warrant obtaining jurisdictional discovery. *See id.*  Therefore, the Court DENIES Plaintiff's motion for jurisdictional discovery.

[17]      The parties agree that Florida law applies to the substantive claims at issue here and that it is relevant to the analysis in this subsection of the Report and Recommendation.  (D.I. 43 at 14; D.I. 44 at 17-20)

With regard to Defendants' arguments as to the contract claims in Counts I-IV, the Court here will largely focus on Counts II and IV.[18]

In Count II of the FAC, which is a breach of contract claim against ECB and AVC for breach of the Stock Pledge Agreement, (D.I. 39 at ¶¶ 144-49),[19] Plaintiff alleges that ECB and AVC "breached the Stock Pledge Agreement by causing SFI to enter [the ABC Proceeding] without prior notice to and consent from Zausner, thereby disposing of Zausner's collateral for [the Subsequent Installments,]" (*id.* at ¶ 148). Defendants argue that Plaintiff has not sufficiently alleged a breach of contract here because Plaintiff has pointed to nothing in the Stock Pledge Agreement requiring Plaintiff's notice or consent in order to put SFI into an ABC proceeding. (D.I. 43 at 15)

Plaintiff, however, responds by: (1) pointing to its earlier allegation in the FAC establishing that, in Section 8 of the Stock Pledge Agreement, ECB/AVC agreed that they would "not . . . dispose of . . . any of the Collateral or any interest therein except as expressly provided for herein or with the prior written consent of Secured Party[,]" (D.I. 39 at ¶ 55 (brackets and emphasis omitted); *see also* Stock Pledge Agreement at ¶ 8); and (2) arguing that because

---

[18]   With respect to Count I, which alleges a breach of contract claim against ECB and AVC for breach of the SPA, (D.I. 39 at ¶¶ 129-43), and Count III, which alleges a breach of contract claim against ECB and AVC for breach of Amendment No. 1, (*id.* at ¶¶ 150-55), Defendants' only argument for dismissal relates to its lack-of-standing argument addressed in Section II.A (i.e., that Plaintiff lacks standing to enforce a breach of the respective agreements and is not owed any money pursuant to the agreements because Plaintiff is not a signatory to the agreements). (D.I. 43 at 15-16; D.I. 44 at 2, 16)  For the reasons the Court set out in Section II.A, these arguments should be rejected.

[19]   Under Florida law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) a breach of the contract and (3) damages that resulted from the breach.  *DNA Sports Performance Lab., Inc. v. Club Atlantis Condo. Assoc., Inc.*, 219 So. 3d 107, 109 (Fla. Dist. Ct. App. 2017).

ECB/AVC are alleged to have "destroyed, dissipated and disposed of the value of Zausner's security interest in 90% of the shares of SFI" via the ABC proceeding, this amounts to a breach of Section 8, (D.I. 39 at ¶ 108). (D.I. 44 at 16-17) These prior allegations from the FAC are expressly incorporated into Count II. (D.I. 39 at ¶ 144) And in light of those allegations, the Court is not persuaded that Count II fails to state a plausible claim.[20]

In Count IV, Plaintiff alleges a claim against ECB and AVC for breach of the implied covenant of good faith and fair dealing with respect to the Stock Pledge Agreement. (*Id.* at ¶¶ 156-65) Pursuant to Florida law, "every contract includes an implied covenant that the parties will perform in good faith." *Bergman v. Royal Caribbean Cruises, Ltd.*, Case Number: 05-21238-CIV-MORENO, 2005 WL 8156741, at *3 (S.D. Fla. Sept. 29, 2005) (internal quotation marks and citation omitted) (discussing Florida law). The implied covenant of good faith and fair dealing is a "gap-filling default rule which comes into play when a question is not resolved by the terms of the contract [between parties] or when one party has the power to make a discretionary decision without defined standards." *Maor v. Dollar Thrifty Auto. Grp., Inc.*, 303 F. Supp. 3d 1320, 1327 (S.D. Fla. 2017) (citing Florida law) (internal quotation marks and citation omitted). Florida courts have disallowed such a claim in two situations: "(1) the implied covenant . . . should not be invoked to override express terms of the agreement[;] and (2) there can be no cause of action absent an allegation that an express term of the contract has been breached." *Bergman*, 2005 WL 8156741, at *3 (internal quotation marks and citation omitted).

Defendants contend that this claim must be dismissed because "there is no underlying breach of the Stock Pledge [Agreement]." (D.I. 43 at 16) However, as discussed above with

---

[20]   In their reply brief, Defendants did not respond to any of Plaintiff's arguments regarding the plausibility of the substantive claims. (D.I. 47)

regard to Count II, Plaintiff has sufficiently alleged a breach of the Stock Pledge Agreement.

Thus, Defendants' argument here too must fail.

### 2.    Equitable Accounting (Count V)

Count V is a claim for equitable accounting, brought against all Defendants.  (D.I. 39 at

¶¶ 166-73)  Under Florida law, this type of a claim can be a stand-alone cause of action; a party

seeking such an accounting must show either:  "(1) a sufficiently complicated transaction and an

inadequate remedy at law[;] or (2) the existence of a fiduciary relationship."  *Schmidt v. Wells*

*Fargo Bank, N.A.*, Case No. 8:20-cv-150-T-33AAS, 2020 WL 758161, at *5 (M.D. Fla. Feb. 14,

2020) (internal quotation marks and citation omitted).

In Claim V, Plaintiff requests an equitable accounting of ECB's and AVC's assets and

finances to determine if those entities fraudulently transferred the funds from the sale of SFI's

assets to Atalanta (the "transaction").  (D.I. 39 at ¶ 169)  Defendants contend that Count V must

be dismissed for four reasons:  (1) such a claim can only be raised "as to the accounts between

the parties to a transaction" (here, the transaction between SFI and Atalanta), but Plaintiff "is a

stranger" to the transaction; (2) Plaintiff fails to allege a fiduciary relationship with any of the

Defendants or with any of the parties to the transaction; (3) the transaction is not complex; and

(4) Plaintiff has an adequate remedy at law (i.e., damages).  (D.I. 43 at 16-17)

These arguments each fail.  With respect to Defendants' first argument, the sole case that

they cite in support, *Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 694 F. Supp. 2d 1275,

1280 (S.D. Fla. 2010), does not actually hold that only parties in direct privity with each other

can seek an equitable accounting from each other in litigation, (D.I. 44 at 17 n.12).  So the Court

cannot find that the claim is insufficiently pleaded on that basis.  Defendants' second argument is

insufficient because establishing a fiduciary relationship is not a requirement if the claim

sufficiently pleads a complex transaction and an inadequate remedy at law. *Schmidt*, 2020 WL 758161, at *5; *see also* (D.I. 44 at 18). As to the third argument, here the FAC alleges that the underlying transaction between the parties (pursuant to the SPA and Amendment No. 1) is complex. (D.I. 39 at ¶¶ 167, 170) And this allegation seems plausible, since: (1) the transaction at issue has generated three separate lawsuits in two federal courts; (2) it involves a "multi-tiered structure for securing payment" for SFI's sale; and (3) implicates a number of different contractual agreements and many different parties/related corporations/relevant actors, (D.I. 39 at ¶ 167; D.I. 44 at 18). *See Lan Li v. Walsh*, CASE NO. 16-81871-CIV-MARRA, 2017 WL 3130392, at *7 (S.D. Fla. July 24, 2017). Finally, as for Defendants' assertion that Plaintiff has an adequate remedy at law, the FAC pleads that Plaintiff cannot assert breach of contract claims against C2B (or the Individual Defendants) because they are not parties to the SPA, and thus cannot obtain an adequate remedy at law at least as to them. (D.I. 39 at ¶ 172) This is sufficient at this stage of the case.

### 3. Tortious Interference with Contract (Count VI)

Count VI is a claim for tortious interference with contract, brought against the Individual Defendants and C2B. (*Id*. at ¶¶ 174-80) Pursuant to Florida law, a plaintiff asserting a tortious interference claim must establish: (1) the existence of a contractual relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship. *All Tag Corp. v. Checkpoint Sys., Inc*., CASE NO. 17-81261-CIV-DIMITROULEAS, 2018 WL 6514795, at *6 (S.D. Fla. Mar. 27, 2018); *Ethan Allan, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994).

As discussed above, the Court has found that Plaintiff may not maintain claims against the Individual Defendants, for lack of personal jurisdiction.  So it therefore focuses on C2B here.  As to C2B, Defendants' primary assertion is that the FAC lacks allegations that any of C2B's acts interfered with the relevant contractual rights, and, more broadly, that C2B "did anything" wrong here.  (D.I. 43 at 18-19)[21]

But this argument is belied by the FAC's allegations.  (D.I. 44 at 19)  The FAC asserts that:  (1) C2B had knowledge of the relevant agreements; (2) it took affirmative steps with ulterior motives to prevent ECB and AVC from paying the Subsequent Installments, such as by causing those parties to sell SFI's assets to Atalanta and diverting the proceeds elsewhere or by initiating the ABC proceedings; and (3) there was no legal justification for C2B's wrongful acts.  (D.I. 39 at ¶¶ 177-79; *see also* ¶¶ 13, 68, 104, 108, 170)

### 4.    Conspiracy Claim (Count VII)

Count VII of the FAC alleges conspiracy to commit tortious interference with contract against the Individual Defendants and C2B.  (*Id.* at ¶¶ 181-87)[22]  Here again, for reasons explained above, the Court focuses only on C2B here.

---

[21]    To the extent that Defendants argue that the claim fails because "Zausner has no contract rights with which any of the Defendants allegedly interfered[,]" (D.I. 43 at 18), the Court has rejected that argument in Section II.A.

[22]    Under Florida law, a civil conspiracy requires:  (1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the commission of an overt act in furtherance of the conspiracy; and (4) damage to plaintiff as a result.  *Eagletech Commc'ns, Inc. v. Bryn Mawr Inv. Grp., Inc.*, 79 So. 3d 855, 863 (Fla. Dist. Ct. App. 2012) (citation omitted).  Furthermore, Florida law states that a valid claim must allege an independent underlying illegal act or tort on which the conspiracy is based.  *See Carney v. IDI-DX, Inc.*, No. 2:12-cv-00449-FtM-29DNF, 2013 WL 4080326, at *3 (M.D. Fla. Aug. 13, 2013); *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997).

As relevant to C2B, Defendants argue that pursuant to Florida law, a civil conspiracy claim must be supported by an underlying wrong, and since here there is no valid claim for tortious interference, there can be no civil conspiracy claim.  (D.I. 43 at 19)  This is not persuasive, however, in light of the Court's above rejection of Defendants' argument for dismissal as to Count VI.  (D.I. 44 at 20)

### D.    Motion to Strike

Lastly, Defendants argue that the Court should strike the FAC's allegations regarding the sale of SFI's assets and the business affairs of SFI.  (D.I. 43 at 20)  Federal Rule of Civil Procedure 12(f) states, in relevant part, that a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f). "The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters."  *Sepracor Inc. v. Dey, L.P.*, Civil Action No. 06-113-JJF, 2008 WL 4377570, at *2 (D. Del. Sept. 26, 2008) (internal quotation marks and citation omitted).  Motions to strike are generally disfavored and "usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties."  *Id.* (internal quotation marks and citation omitted).

Defendants have not demonstrated that such allegations are "redundant, immaterial, impertinent[] or scandalous[.]"  *See* Fed. R. Civ. P. 12(f).  Defendants' basis for striking the allegations is their argument that only the assignee (here SFI, not Plaintiff) has standing to pursue an inquiry regarding the details of the sale of SFI's assets.  (D.I. 43 at 20)  But this is not an appropriate basis to strike these allegations under Rule 12(f).  *See, e.g.*, *Peralta v. Wonderful Citrus Packing LLC*, No. 1:15-cv-00263-TLN-JLT, 2016 WL 726908, at *4 (E.D. Cal. Feb. 24, 2016).  The Court agrees with Plaintiff that the allegations at issue provide relevant context for

Plaintiff's claims.  (D.I. 44 at 20)  Therefore, the Court recommends that Defendants' Rule 12(f) request be denied.

## III.   CONCLUSION

For the foregoing reasons, the Court recommends that the motion to dismiss be GRANTED-IN-PART and DENIED-IN-PART.  Specifically, it recommends that this motion be granted as to Defendants' argument that there is no personal jurisdiction over the Individual Defendants, and denied in all other respects.  And the Court orders that the motion for jurisdictional discovery be DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.


Dated:  January 31, 2022

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE


32